# CASES

ADJUDGED IN

# THE COURT OF CHANCERY

## OF THE STATE OF NEW JERSEY.

### FEBRUARY TERM, 1870.

---

### MARTIN'S EXECUTORS *vs.* MARTIN and others.

1. A mortgage made before the act of Congress making notes a legal tender, must be paid in gold or silver coin.

2. The power of regulating contracts is left with the states; and includes declaring what shall be a legal tender.

3. Congress cannot, to give effect to one provision of the constitution, pass a law prohibited by other provisions, or inconsistent with its spirit.

---

The bill in this cause was filed on the 13th day of November, 1869, by the executors of David Martin, deceased, to foreclose a mortgage given in May, 1852, by William Martin, jun., to David Martin's testator, to secure the sum of $428. No answer was filed. On the 15th day of February, 1870, a decree *pro confesso* was taken against all the defendants, and the matters referred to a master. The master reported the amount due. The frame of the decree, as to payment, was as follows: "It is ordered, &c., that the said mortgaged premises be sold to raise and satisfy the several sums of money due to the said complainants, &c., that is to say, the sum of $836.74 in gold and silver coin, being such

money as was legal tender at the time of the execution of the complainant's bond and mortgage," &c.

*Messrs. Vanatta & Demott,* for complainants.

THE CHANCELLOR.

This suit is for the foreclosure of a mortgage made in May, 1852, for $428, payable in July of that year. Both parties were, and are, residents of this state. The complainants insist that the mortgage being prior to the act of February, 1862, which declares certain notes to be a legal tender, must be paid in gold or silver coin, and that he is entitled to a decree that it be so paid.

The recent decision of the Supreme Court of the United States in the case of *Hepburn* v. *Griswold,* settles the question on which this application depends. And under ordinary circumstances, after a question so clearly within its jurisdiction had been settled by that court, I would not feel at liberty to discuss the principles on which its decision was founded, or even to state the reasons why I concur in it. My only duty would be to submit to it as authority.

But the country is already notified that an effort will be made to have this question re-considered by that court when its constituents shall have been changed, as they soon must be. The decision was the opinion of only five of the eight judges who heard the argument and re-argument of the case; and one of those five retired after the decision was agreed upon and before it was announced. The two judges to be added to the bench may agree in opinion with the minority; and the majority so constituted may feel bound to declare the law according to their individual opinions, and not as established by the court. Under these circumstances, which I cannot ignore, the question may not be definitively settled, and I feel called upon to express my own views as I would have done had there been no decision by the Federal court.

The question is one of great practical importance. The power to make notes issued by the United States a legal tender for debts, would no doubt, at times when public credit is doubtful, and the need of the government pressing, give aid in raising money, and procuring what money will purchase; it might thus insure success in a foreign war or domestic insurrection. It is contended, and perhaps truly, that the exercise of this power was requisite, as it certainly was useful, in suppressing the late rebellion.

On the other hand, it is a power liable to great abuse. It can seldom if ever be exercised, especially as to past debts, without great injustice, and violating the first principles of the social compact. For the incidental advantage to the government, it in effect takes the property of the creditor and bestows it on the debtor.

But these considerations cannot aid in determining the question, which is, was such power conferred on Congress by the constitution? The magnitude of the consequences only render it more important that the question should be carefully considered. This consideration requires also a large and extended view of the objects of the constitution, as designed by those who framed and adopted it. We must look beyond the mere letter of the instrument, to what was intended to be effected.

A constitutional government, as distinguished from an absolute government or a despotism, is one limited in its powers. The powers conferred are sovereign but not universal. It is not necessary to attain a good and efficient government, that the people to be governed should surrender all their natural rights to its dominion. That people is most free who surrender the fewest, and none but those necessary to attain the end. This maxim applies as well when the government is purely democratic, as when vested in a single and hereditary monarch. The despotism of a majority, when unjust, is as insufferable as that of a king. Constitutions are the only social compacts which have ever had actual existence, and construing them, usually consists

in determining whether the power exercised in the case presented was conferred on the government.

The Federal Constitution calls for another consideration. The sovereign power had before been vested in the state governments, with certain limitations. In all, there were many things over which neither the legislature nor any other department of government had power. The rights, over which no control was given, were reserved to the people, but were reserved to them individually. There was no power in the people as a body, as a grand democracy, by a vote of the whole, to invade these rights. When these were reserved they could not prohibit the free exercise of any religion, or affect the enjoyment of life, liberty, or property, by any bill of attainder, *ex post facto* law, or any direct vote, but only by due process of law. It is, therefore, no reason for holding that a power is conferred upon the national government, that such power would otherwise be destroyed, because there is provided no mode in which the people can exercise it. Many powers, like the power to take life, liberty, or property at will, a power only of absolute despotisms, were not intended to be exercised by any one, but to be wholly annihilated.

In forming the Federal Constitution, a limited number of sovereign powers were conferred upon the national government; some to be exercised by it exclusively, others concurrently with the states, so far as this concurrent exercise was practicable. And in no case will the mere fact that a certain power is prohibited to the state by its own or the Federal Constitution, warrant or support the conclusion that it is vested in Congress. That conclusion depends upon the express or implied grant.

These principles are admitted by every one; they are not repeated here to establish or strengthen them, but because they appear to be those which should guide me in arriving at a correct conclusion in this matter.

The constitution prepared and proposed by the convention, was adopted by the people of each state. That adop-

tion gave it validity. The intention of the people is the rule for its construction. That intention must be gathered from the instrument published to, and read by them at its adoption. Where it admits of doubt, aid may be had from the history of its origin, and from other cotemporaneous facts, known as well to those who adopted it as to us.

The people and governments of the states were anxious to retain as much of the sovereign power in the state governments as could be done consistently with an effective national government. The great object of discussion was how much should be surrendered; and the constitution declared what was surrendered. It was the understanding of all, as well as the plain effect of the instrument, before the adoption of the tenth amendment, that all powers not delegated were reserved. Without this understanding that instrument would not have received the assent of a majority of the states.

All powers necessary to constitute the government a nation, and to conduct its intercourse with other nations, were intended to be conferred. The power to regulate commerce among the states, and the surrender of fugitives, and other matters regulated by treaty between independent states, was also conferred, of necessity, as the states were deprived of all treaty-making power among themselves. But the government and management of the internal concerns of each state, the election of state officers, the organization of their courts and local governments, and the making all laws with regard to the rights of persons and property, were intended to be left to the states. This includes all laws regulating the transfer of, and succession to property, relating to contracts, their construction, enforcement, and discharge, and to remedies for the protection of these rights.

This was at the time, and has always been, the universal understanding of the object and effect of the constitution. Chief Justice Marshall, in advocating its adoption in the Virginia convention, to obviate objections to the provision giving jurisdiction to the Federal courts in controversies between citizens of different states, declared that the law by

2 N*

which such controversies must be decided, could only be the local law of the state where the contract was made, and that such was the established principle of jurisprudence. He further added in the same address, (3 *Elliot's Deb.* 553,) " Has the government of the United States power to make laws on every subject? Does he understand it so? Can they make laws affecting the mode of transferring property, or *contracts*, or claims between citizens of the same state? If they were to make a law not warranted by any of the powers enumerated, it would be considered by the judges as an infringement of the constitution which they are to guard. They would not consider such a law as coming under their jurisdiction. They would declare it void." ·

As part of the legislative power over contracts, and their enforcement and fulfillment, thus *left with*, not *reserved to* the states, was the power of declaring what should be a legal payment, or tender of payment, of any debt.

The states had power, by regulations properly within the province of the law-making power, to place obstacles in the way of compelling performance of contracts, and in many ways to impair their obligation. This, so far as the citizens of any state alone were concerned, might not be an evil for which the constitution was called on to provide. But, as each state gave up its nationality, and surrendered the right by which our nation may, by international law, call upon another not to shield, by its laws, its own subjects from their obligations to the citizens of the other, it was proper that the constitution should provide for this difficulty which it created. It was determined to do it by a clause which applied to debts and contracts between all, whether citizens of the same state or not. A provision so eminently just could not be made too extensive. Such laws were well classed with bills of attainder and *ex post facto* laws; and the prohibition was introduced into the constitution on the same ground as the guaranty of a republican form of government to each state. They were prohibited as inconsistent with

that liberty and security which both state and national governments were designed to provide for.

The proposition is clear, and I think has never been disputed, that the exclusive right of regulating contracts belongs to the states. This, without the provision to the contrary, would have left with them the unlimited power of declaring what should be a legal tender, as well as the power of impairing their obligations by stay laws, appraisement laws, or any of the devices contrived for that object. Luther Martin, in his letter to his constituents, upon his retiring from the convention, assumes that this would have been the case, and contends that this power ought not to have been surrendered by the states; that it was useful, and might be needed. Taking this power of making anything but coin a legal tender from the states did not confer it on the United States. It was simply reserved by the people from either sovereign; from the state by positive prohibition, from the United States by not being granted. And the fact that it was deemed necessary to insert a provision against a state making anything but gold and silver a legal tender, shows that this power was considered as reserved to the states; and if so, as in its nature it is an exclusive power, it would not be vested in Congress. The evils ensuing from the continental paper currency, at the close of the war of the Revolution, had created a general desire to be protected from any paper currency, whether national or state, being made a legal tender. That desire was thought to be accomplished by prohibiting it to the states, and not granting the power to Congress.

It was once contended that this power was conferred in the grant of power to regulate commerce. This view, I believe, is now abandoned. The power is "to regulate commerce with foreign nations and among the states." This would clearly not reach a debt due to a citizen of the same state, as was the case in *Hepburn* v. *Griswold,* and is, in this suit.

The power to coin money and regulate the value thereof,

and of foreign coin, so clearly refers to coined money alone, and to its denominational value, that it is not seriously urged as the foundation of the power. It was never claimed that this gave to Congress the power to regulate the actual relative value even of money, by declaring the value of a dollar in wheat at Chicago, in cotton at Mobile, or in labor at New York. The power of Congress to make notes a legal tender is now placed, by almost all who contend for it, on the last clause of the eighth section of the first article. This gives power "to make all laws necessary and proper for carrying into effect all powers vested by this constitution in the government of the United States."

In the great and leading case of *McCulloch* v. *Maryland,* 4 *Wheat.* 316, this clause of the constitution was carefully considered, and two rules for its construction adopted. One was, that the word "necessary" was not to be taken in its strict literal meaning, but extended to, and included such laws as were "appropriate" and "adapted" to carry into effect the other provisions, although not absolutely necessary for that end. The other rule was, that in making such laws, Congress was the sole judge of what was necessary, or appropriate and proper for that object. These two rules, if they had been made part of the constitution, or had been adopted to be applied without qualification, would confer on Congress the power to declare what should be a legal tender, and to exercise any other sovereign power, not only those not granted, but those prohibited by the letter and spirit of the constitution. Any power not granted or prohibited might be held not to exist, when exercised directly to give effect to its own purpose, or for objects not within the scope of the constitution, but when exercised for an end within such scope, to be valid and constitutional. Thus, the power to pass bills of attainder, and *ex post facto* laws, to lay direct taxes in any ratio, to grant titles of nobility, to regulate the transfer of or succession to property, and the law of contracts, could not be exercised by Congress simply to establish wise and beneficial codes of law on these matters. But if

Congress, for prosecuting a war, or putting down domestic insurrection, matters clearly within its province, should judge it necessary or appropriate to attaint and execute, without trial, all who aided or favored the enemy or the insurgents, or to confiscate and seize their property by *ex post facto* laws, these rules would confer that power.  Had it been judged necessary or conducive to success in the late war, Congress could have conferred on our successful generals and admirals hereditary titles of nobility, which would have made them equal to the Wellingtons and Nelsons of Great Britain, distinctions well deserved.  So in case of any great need of money for the legitimate objects of government, as the payment of the national debt, a need that may soon occur, Congress could declare that every debtor who would advance to the United States half the amount of his debt, and pay or tender to his creditor the scrip for that amount, should be discharged from the whole debt.  This would aid the government much in raising money, and a law passed for that object, and not for the purpose of relieving the debtor from his contract, which would be an incident to the law, would, on the principle stated, be constitutional.  There is no power, however arbitrary or despotic, or however clearly reserved or forbidden by the Federal Constitution, that Congress might not assume, under this construction.

This would give to it absolute power without any restriction.   It could pass any law by simply declaring that it was done for an object legitimate of itself.   It could do anything, short of declaring a dictator, or establishing a hereditary dynasty; and even these might be done by determining that they were necessary, or useful and appropriate, for prosecuting a doubtful war, or putting down a powerful insurrection.

Such extended powers over the internal affairs of the states, even if not carried out into such flagrant abuses, would destroy the equilibrium of our well balanced system·  It would totter and fall by its own weight.

There must be some limit to the power of Congress to

extend its own authority by exercising powers prohibited or not granted, to carry into effect such as are granted. The rules laid down in *McCulloch* v. *Maryland* have been so long regarded as the authoritative exposition of the constitution in this regard, that they must be received as law even by such as would have hesitated in adopting them were it a new question.

But there are contained in the opinion delivered in that case, qualifications and restrictions that are part and parcel of the decision, which take away from the rules laid down, much if not all of this pernicious effect. After showing that the word "necessary" was not to be taken in its strict sense, so that no means could be adopted if others could effect the end, and declaring that it here means "needful," "requisite," "essential," "conducive to," the Chief Justice declares: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional."

Bills of attainder and *ex post facto* laws being prohibited, are not within this decision. Laws regulating contracts, if not inconsistent with the letter, are plainly so with the spirit of the constitution and the universal understanding at its adoption, and ever since. And they are prohibited by the ninth and tenth amendments as certainly and clearly as if a direct prohibition to pass any law regulating contracts had been incorporated into the constitution.

This rule is definite, it is safe. Let Congress abstain from making any laws for the purpose indicated, which are expressly prohibited, or intended to be reserved to the states exclusively, and, therefore, prohibited by the spirit of the constitution, and its legislation will not interfere with the rights of the people or the states, or endanger the perpetuity of our institutions.

This limitation does not render the clause in question nugatory. Besides the powers expressly prohibited and those

clearly reserved to the states, there is a large class incidental to the exercise of any legislative authority not prohibited or reserved by the letter or spirit of the constitution, powers to be exercised by each government in executing its appropriate functions. Such are, creating offices, appointing officers, limiting their powers, and defining their duties, and providing for their removal. Among these was the creation of a corporation, or giving to certain persons an artificial existence by a corporate name instead of their individual names, for the purpose of discharging the duties of such offices. The power of creating corporations for state purposes was retained by the states, but like the power of appointing state officers, and laying state taxes, was not inconsistent with the like powers in the general government for its own purposes. The power to issue notes to be circulated as money, given to a corporation, was an appropriate means of collecting and transmitting the revenue, that interfered with no power reserved or intended to be reserved to the states. Each state had power to create corporations authorized to issue like notes, or to permit individuals to issue them. These are not the exercise of a substantive power, but the using incidental means to give effect to such power. In his opinion the Chief Justice says: "The power of creating a corporation is not like the power of making war, or laying taxes, or of regulating commerce, a great substantive and independent power, which cannot be applied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which other objects are accomplished." This he could not have said of the power of regulating contracts, or of declaring what should be a legal tender in payment of their obligations. No one can read his opinion, or carefully follow his reasoning without being convinced that he never would have applied its doctrines to the regulation of contracts, or to making the notes of the bank a legal tender in payment of debts.

The limitations in this opinion are not confined to means

expressly prohibited, but extend to such as are not consistent with the spirit of the constitution.

Before and at its adoption it was understood that the constitution did not authorize Congress to exercise powers not granted, because they were not prohibited, or declared to be exclusively vested in the states.

Alexander Hamilton, in the thirty-third number of the " Federalist," declares : " Though a law laying a tax for the use of the United States would be supreme in its nature, and could not be legally opposed or controverted, yet a law abrogating, or preventing the collection of a tax laid by the authority of a state (unless upon imports or exports) would not be the supreme law of the land, but an usurpation of power not granted by the constitution." The power to regulate and control state taxation was not granted to the United States, or secured to the state by any positive provision. But, like the power to regulate contracts, it was understood to be beyond the control of the United States by those who framed the constitution, and by those who adopted it on the faith of these expositions. The power of annuling state taxation, if it exists because not expressly prohibited, may now be usefully exercised by Congress to aid in levying and collecting large taxes for payment of the public debt, which it would much facilitate.

A law compelling every creditor to pay to government one half of what was owing to him, would be deemed oppressive and unjust. The legal tender act is more so; it compels the creditor to accept part of the value of his debt as full payment, without the advantage of having the other part received by his government; and it enables the debtor to discharge his debt by payment of part of its value, without contributing at all to the support of government. But the constitutionality of a law does not depend upon its being just. But its injustice, and the inducements and influence that may cause the re-enactment of its baneful provisions for selfish purposes, should make courts pause in conferring the power by judicial construction, even though it may have

been, or may be in the future, of great use. The security and continuance of a free and just government is more important than its extension or its power.

The legal tender provision not only regulates contracts, a power reserved to the states by the letter and spirit of the constitution, but it clearly impairs their obligation, from doing which the states are prohibited. The word dollars in a contract means what it designated when the contract was made; it can mean nothing else. It means the coin so called. This was not only the meaning of the parties, but it was the legal construction of the contract. And the act directing a paper dollar to be received, did as much impair its obligation as if it had declared that hereafter a silver dime should be denominated a dollar, and be received, and be a legal tender, in payment for that amount. The dime would be a lawful dollar from the passage of the act and at the time of the tender, but could not discharge the contract as long as the regulation of contracts is with the states, and the provision against passing any laws impairing their obligation remains in the constitution. That alone prevents a state from making a dime, which is a silver coin, a legal tender for a dollar due on a prior contract. The state legislatures can declare thirty pounds to be a bushel of wheat, or twenty thousand superficial feet to be an acre of land; these enactments would be valid; but it is beyond their power, by any positive provision for the purpose, to make a purchaser receive them in fulfillment of a contract in which, when made, these terms required more than double that quantity. The power of impairing contracts by making anything a legal tender is not vested in Congress by its being taken from the states, any more than the power to impair them by changing the contents of a bushel or an acre.

In these cases the property, or rights of property, of an individual would be taken directly by legislative act without process of law. This is prohibited to most of the state legislatures by the state constitutions, as it is to Congress by that of the United States. The spirit of the fifth amend-

ment, beyond dispute, shows that it was intended to prohibit, and I think its letter does prohibit, Congress from any direct interference with property or rights of property.

This reasoning includes the legal tender act, and brings it within the limitations in the decision in *McCulloch* v. *Maryland,* which excepts means prohibited by the letter or spirit of the constitution. It shows, too, that it is not authorized by the clause of the first article, which mentions laws necessary and *proper.* It would not be proper to pass a law forbidden by one provision of the constitution or by its spirit, for the purpose of giving effect to other provisions. The word proper will have no efficacy here unless it is held to mean "consistent with propriety," one of its significations, perhaps its original one. The other signification of "appropriate," or "suited to," is included and swallowed up in the word necessary. There is no propriety or consistency in violating one provision of a constitution to enforce another.

The conclusions to which I have arrived are, that the regulation of contracts was intended to be reserved and was reserved by the constitution exclusively to the states. That this regulation includes determining what shall be a legal tender in payment of debts, confined to gold and silver coin. That the power given to pass laws necessary and proper to carry its provisions into effect, did not confer power to pass any law which other provisions of the constitution had prohibited or had reserved to the states, either by express words or by its spirit and intention. And, therefore, the law in question is void, so far as it makes the notes of the United States a legal tender for debts contracted before its passage.

The same principles would apply to debts contracted since. But as to these, the question arises whether they were not contracted in reference to this law, and whether the true meaning and effect of such contracts is not that the debts should be paid in what was then known as lawful money of the United States.